**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**LEVOLA BLACK,**

      **Plaintiff,**

**vs.**                                **Case No. 4:09cv71-MP/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

      This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).   It is recommended that the decision of the Commissioner be reversed and the Commissioner ordered to award benefits.

**Procedural status of the case**

      Plaintiff, Levola Black, applied for disability insurance benefits and supplemental security income benefits.  Her last date of insured status for disability benefits is

December 31, 2010. Plaintiff alleges disability due to mental retardation, right eye blindness, and degenerative disc disease.

Plaintiff was 47 years old at the time of the administrative hearing (on February 13, 2008), has a limited education in special education classes, and has past relevant work as a mushroom picker at a mushroom farm and a packing line worker. The Administrative Law Judge found that Plaintiff's intellectual functioning did not meet or equal Listing 12.05C. R. 22. He found that Plaintiff has the residual functional capacity to do a limited range of light work. *Id*. He found that she could return to her past relevant work, could do other jobs identified by the vocational expert, and thus was not disabled. R. 25-27.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial

deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211

(11th Cir. 2005).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.     Is the individual currently engaged in substantial gainful activity?

2.     Does the individual have any severe impairments?

3.     Does the individual have any severe impairments that meet or
       equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.     Does the individual have any impairments which prevent past
       relevant work?

5.     Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work. If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy. Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner. Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Legal analysis**

Plaintiff contends that the ALJ erroneously concluded that Plaintiff's impairments

did not meet or equal Listing 12.05C. Doc. 20, p. 12. The Commissioner's rules

provide that if the claimant has an impairment that is listed in or equal to an impairment

listed in Appendix 1, Subpart P, following 20 C.F.R. § 1599, then a finding of disability

will be made at Step 3 without considering the claimant's age, education, and work

experience. 20 C.F.R. § 1520(d). "The Secretary explicitly has set the medical criteria

defining the listed impairments at a higher level of severity than the statutory standard.

The listings define impairments that would prevent an adult, regardless of his age,

education, or work experience, from performing *any* gainful activity, not just 'substantial

gainful activity.' " Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107

L.Ed.2d 967 (1990) (emphasis by the Court). A claimant is entitled to benefits if it is

shown that his or her limitations meet, or are medically or functionally equal to, the

limitations set forth in the Listing. Shinn ex rel. Shin v. Commissioner, 319 F.3d 1276,

1282 (11th Cir. 2004).

The claimant has the burden of proving that his impairments meet or equal a listed impairment by presentation of specific evidence of medical signs, symptoms, or laboratory test results meeting all of the specified medical criteria.  Sullivan v. Zebley, 493 U.S. at 530, 110 S.Ct. at 891.  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id*. (emphasis by the Court).

Listing 12.05C provides in relevant part:

12.05 *Mental retardation*:  Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

                    *                 *                    *

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Listing 12.05C, Appendix 1 to Subpart P of Part 404 – Listing of Impairments, 20 C.F.R.

**Evidence of a valid intelligence quotient test score**

The evidence relevant to intelligence testing is the following.  Plaintiff was evaluated on September 19, 1969, when she was age 9.  R. 115.  The staff psychologist determined that Plaintiff was "presently functioning in the 50 to 60 I.Q. range."  *Id*.  He wrote:

Although she is almost ten years of age at the time of the present
evaluation, her performance on the Binet yielded a basal age of four years
and six months.  She failed all items at year eight.  She is quite limited in
her intellectual strengths, in that she was able to pass only three items at
the average six year level and one item at the seven year level. . . .  In
summary, her present level of intellectual functioning appears to be typical
of the average five year old.

*Id.*  He recommended that she be placed in a special education class in the "borderline

educabl[e] retarded group."   *Id.*  He thought that her prognosis for academic

achievement was "not very promising" and that her ultimate achievement level would be

third grade.  *Id.*  A Wechsler Intelligence Scale was obtained on February 17, 1969.  R.

117.  While Plaintiff's Wechsler score is not noted, she was found to be "considerably

below average" in intellectual development, with that category the lowest of the

categories provided.  *Id*.

On May 16, 1975, Plaintiff was given the Wechsler Intelligence Scale for

Children-R.  R. 113.  She was then almost 15 years old.  *Id*.  She achieved a verbal I.Q.

score of 65, a performance I.Q. score of 61, and a full scale I.Q. score of 59.  *Id*.  There

is no evidence that these test scores were considered to be invalid.  *Id*.  It was

determined that Plaintiff was "functioning within the Moderate Mental Retardation range

of intelligence."  *Id*.  It was thought that her deficits "likely result from chronic and diffuse

cerebral impairment."  *Id*.  The psychologists who conducted the tests recommended

that Plaintiff continue in special education classes.  R. 114.

On September 25, 1978, when Plaintiff was 18 years old, a third intelligence test

was administered.  R. 120.  She achieved a verbal I.Q. score of 75, a performance I.Q.

score of 75, and a full scale I.Q. score of 73.  *Id*.  There is no evidence that these scores

were considered to be invalid. *Id.* She was found to be functioning in the borderline category of intelligence. *Id.* It was thought that she continued to qualify for special education classes for the educable mentally retarded.

Plaintiff made good grades in special education classes. R. 112. She graduated from 12th grade in 1979 with a special education diploma. *Id.*

On July 23, 2008, after the Administrative Law Judge issued his decision, Plaintiff was given a fourth intelligence test by Brent Decker, Ph.D. R. 513. She was then 48 years old. *Id.* Her daughter drove her to the appointment and filled out the paperwork. *Id.* Dr.

Decker found Plaintiff to be "distant," responded to questions in "very short and brief answers," and had trouble reading and putting her thoughts together. *Id.* She had worked for Quincy Farms for 19 years. *Id.* She had never married, and had three children, ages 29, 23, and 14. *Id.* She had stopped working after she injured her back. *Id.* In 2001, she had back surgery after an injury sustained in a motor vehicle accident. R. 514. She injured her back again on the job in 2005, and had not worked since that time due to chronic pain. *Id.* Her job required climbing, lifting, and bending, which she should could no longer do due to the injury. *Id.*, R. 513. She said she could drive a motor vehicle, but not far. *Id.* She said she could not read very well, and her daughter read her mail for her. *Id.* It was noted that "[n]umerous testing completed . . . dating back to 1969 when she was 9 years old indicate that her level of intellectual functioning was in the mental retardation or borderline intellectual functioning range." *Id.*

On the Wechsler test administered by Dr. Decker, Plaintiff scored a verbal I.Q. of 71, a performance I.Q. of 69, and a full scale I.Q. of 67. R. 514. There is no evidence that these test scores were considered to be invalid. *Id*. It was noted by Dr. Decker that the full scale score "is usually considered to be the most representative measure of global intellectual functioning," and Plaintiff's full scale score of 67 "places her within the extremely low range of intellectual functioning." *Id*. Plaintiff tested at grade 2.1 in reading, grade 3.0 in numerical operations, and grade 2.3 in spelling. R. 515.

An assessment was made of Plaintiff's "adaptive skills" based upon information provided to Dr. Decker by Plaintiff's daughter. R. 516. It was explained that this assessment "enables one to better understand the extent to which individuals take care of themselves and relate to others during daily living in 9 critical adaptive skill areas." *Id*. Her general adaptive composite score, 65, was "extremely low" and in the bottom 1 percentile. *Id*.

Dr. Decker found that Plaintiff had reported a number of depressive symptoms. R. 516. He noted a score "in the severe range of clinical depression." *Id*. She was disappointed in herself, cried frequently, felt guilty, had suicidal thoughts, and had trouble concentrating. *Id*. Dr. Decker''s assessment was mild mental retardation and depressive disorder, not otherwise specified. R. 517. Dr. Decker said:

> The patient's cognitive skills are very limited and have clearly impacted her adaptive skills and ability to work. She was able to do manual field work but her physical abilities have declined with age and injury. Because of the above problems, [Plaintiff] has been more depressed. It will be very difficult for [Plaintiff] to learn a new job skill as well as maintain the stamina necessary for any type of job due to her limited intellectual abilities and physical problems.

R. 517. Dr. Decker noted that despite her cognitive limitations, Plaintiff had raised three children and worked for many years, but it appeared that her job "was much more physically oriented than mentally challenging." *Id.* He said that once her physical abilities broke down and failed, she could no longer do that job and did not appear to be suitable for other jobs. *Id.* He also noted that the oldest daughter, who brought Plaintiff to the testing, appeared to take care of the other two siblings, completed the paperwork, and he noted that Plaintiff said she had had a "lot of family support." *Id.*

Dr. Decker was of the opinion that Plaintiff's condition met Listing 12.05C based upon her I.Q. scores, adaptive skills, and physical problems. R. 518. He thought that Plaintiff was markedly impaired in her ability to understand, remember, and carry out simple and detailed instructions, to maintain concentration and attention for extended periods of time, to interact appropriately with the public, to respond appropriately to work pressures in a usual work setting, to respond to changes in a routine work setting, to perform activities within a schedule and with a consistent pace, to sustain an ordinary routine, and to complete a work day and week without an unreasonable number of rest breaks. R. 519-520. He also found Plaintiff to be markedly limited in her ability to manage household expenses, to drive to and from unfamiliar places, to respond appropriately to normal pressures of daily living, and to be aware of normal hazards and take precautions. R. 520-521. He thought that she would be absent from work more than three times per month and could not manage her own funds. R. 521.

As noted earlier, Dr. Decker's intelligence quotient testing was not considered by the ALJ because it was obtained after his decision. At the beginning of the

administrative hearing, Plaintiff's attorney asked the Administrative Law Judge to obtain

a current assessment of Plaintiff's intelligence quotient.  R. 590.  The ALJ said he would

"see," wanting instead to inquire about Plaintiff's adaptive functioning.  R. 591.  He

made reference to "recent 11th Circuit" jurisprudence "that suggests even though the

person may have an IQ within that range, if their adaptive function is above that, then

that is also [a] consideration, so it's not just the numeric score that matters."  *Id.*  He

ultimately declined to acquire a more current intelligence assessment.

Dr. Decker's intelligence evaluation was submitted to the Appeals Council.  The

Appeals Council noted the existence of Dr. Decker's report and said:

> The Administrative Law Judge decided your case through April 7, 2008.
> This new information is about a later time.  Therefore, it does not affect the
> decision about whether you were disabled beginning on or before April 7,
> 2008. . . .  If you want us to consider whether you were disabled after April
> 7, 2008, you need to apply again.

R. 4-5.

The reasoning of the Appeals Council was error.  In Hodges v. Barnhart, 276

F.3d 1265 (11th Cir. 2001), the court held that "absent evidence of sudden trauma that

can cause retardation, the IQ tests create a rebuttable presumption of a fairly constant

IQ throughout her life."  276 F.3d at 1268.  The court concluded:

> We agree with other circuits in concluding that there is a presumption that
> mental retardation is a condition that remains constant throughout life.
> Therefore, we find that a claimant need not present evidence that she
> manifested deficits in adaptive functioning prior to the age twenty-two,
> when she presented evidence of low IQ test results after the age of
> twenty-two.

*Id.*, at 1266. Since mental retardation remains constant throughout life, Dr. Decker's assessment of Plaintiff's intellectual functioning was highly relevant evidence and related back throughout the period of claimed disability.

This finding changes the focus of this court's review. While it is arguable that the ALJ's refusal to acquire a current assessment of Plaintiff's intellectual abilities was error,[1] it is simpler to ask whether the decision of the Appeals Council, when combined with the decision of the ALJ, which the Appeals Council adopted, is supported by substantial evidence in the record. This is so because the court "must consider evidence not submitted to the administrative law judge but considered by the Appeals Council when that court reviews the Commissioner's final decision denying Social Security benefits." Ingram v. Commissioner of Social Sec. Admin., 496 F.3d 1253, 1258 (11th Cir. 2007).

> The settled law of this Circuit is that a court may review, under sentence four of section 405(g), a denial of review by the Appeals Council. When no new evidence is presented to the Appeals Council and it denies review, then the administrative law judge's decision is necessarily reviewed as the final decision of the Commissioner, but when a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous.

---

[1] "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . ." Sims v. Apfel, 530 U.S. 103, 110-111, 120 S.Ct. 2080, 2085, 147 L.Ed.2d 80 (2000), citing Richardson v. Perales, 402 U.S. 389, 400-401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a *basic* obligation to develop a full and fair record." Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997) (emphasis added), *citing*, Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981). This basic duty exists whether or not the claimant is represented. Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995) (citation omitted).

496 F.3d at 1262.  A denial of review by the Appeals Council is a "final decision" of the

Commissioner.  *Id.*, at 1263 (agreeing with cases from the Second, Fourth, Fifth, Eighth,

Ninth, and Tenth Circuits).

> Before a "final decision" of the Commissioner is entered for the purpose of
> judicial review under section 405(g), a claimant must appeal to the
> Appeals Council, which then may deny or grant review.  *See id.* §
> 416.1400(a)(5) (when the claimant's appeal to the Appeals Council is
> denied, "we will have made our final decision"); *id.* § 404.900(a)(5) (same);
> *see also Bowen v. City of N.Y.*, 476 U.S. 467, 482, 106 S.Ct. 2022, 2031,
> 90 L.Ed.2d 462 (1986) ("Only a claimant who proceeds through all three
> stages [of administrative review] receives a final decision from the
> Secretary.").  If a decision by the Appeals Council is necessary to create a
> "final decision" of the Commissioner for the purposes of judicial review,
> then it follows that the decision of the Appeals Council is, at least, a part of
> that "final decision."

*Id.*, at 1264.

The decision of the Appeals Council is not based upon substantial evidence in

the record.  The Appeals Council is not at liberty to pick only the evidence that supports

its decision, ignoring other evidence without discussion, and this court's "substantial

evidence" review *must* consider all of the evidence in the record.[2]  Listing 12.00

provides: "In cases where more than one IQ is customarily derived from the test

administered, e.g., where verbal, performance, and full scale IQs are provided in the

---

[2] "A 'substantial evidence' standard, however, does not permit a court to uphold the
Secretary's decision by referring only to those parts of the record which support the ALJ.
A reviewing court must view the entire record and take account of evidence in the
record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720
F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and
has sufficiently explained the weight he has given to obviously probative exhibits, to say
that his decision is supported by substantial evidence approaches an abdication of the
court's 'duty to scrutinize the record as a whole to determine whether the conclusions
reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981)
(citations omitted).

Wechsler series, we use the lowest of these in conjunction with 12.05."  The I.Q.

estimated score for age 9 was 50 at the lowest and 60 as the highest, but this was only

an estimate without testing.  At age 15, however, Plaintiff had a valid lowest I.Q. score

of 59.  At age 18, the lowest score was 73.  At age 48, the lowest score was 67.  There

is no evidence that Plaintiff did not put forth a good faith effort on these tests and none

of the experts conducting the tests expressed any doubts about the validity of the

scores.  Thus, there is no evidence from which the ALJ might have properly concluded

that the scores were invalid.  *See*, Cammon v. Astrue, 2009 WL 3245458, *10 (N.D. Ga.

Oct05, 2009) (No. CIV. A. 3:08-CV-0131-) ("While the ALJ correctly noted that Dr.

Maierhofer did not specifically state that the IQ scores were valid, he also did not state

that the scores were invalid.").

> The Administrative Law Judge found, however, that:
>
> Listing 12.05C is not met because the claimant's adaptive functioning is
> consistent with the higher and most recent IQ scores.  The claimant
> testified that she could read and write simple notes and perform simple
> arithmetic problems.  Thus, she is not illiterate as that term is defined in 20
> CFR Sections 404.1564(b)(1) and 416.964(b)(1).  She reported no
> difficulty communicating with others in the workplace.  The claimant was a
> single parent who raised three children, worked for many years and
> managed her household finances.  She is independent in her activities of
> daily living and serves as the representative payee for her minor
> daughter's SSI monies including completing the required Social Security
> paperwork connected with this fiduciary responsibility.  The claimant's
> level of adaptive functioning refutes a finding of mental retardation;
> therefore, the requirements of Listing 12.05C are not satisfied.

R. 22.  Thus, the ALJ implicitly found all I.Q. scores to be valid, but determined that the

age 18 score of 73 was more representative of Plaintiff's intellectual functional level due

to evidence of adaptive functioning.

It is permissible to consider evidence of adaptive functioning in determining the weight to be given an I.Q. score. In <u>Lowery v. Sullivan</u>, 979 F.2d 835 (11th Cir. 1992), the court held:

> Generally, a claimant meets the criteria for presumptive disability under section 12.05(C) when the claimant presents a valid I.Q. score of 60 to 70 inclusive, and evidence of an additional mental or physical impairment that has more than "minimal effect" on the claimant's ability to perform basic work activities.

979 F.2d at 837. The court further held: "This court, however, has recognized that a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record of the claimant's daily activities and behavior." *Id.*, *citing* <u>Popp v. Heckler</u> 779 F.2d 1497, 1499 (11th Cir. 1986).[3] In determining how to give weight to an I.Q. score, it is appropriate to consider medical reports, daily activities, behavior, and other evidence in the record. <u>Popp</u>, 779 F.2d at 1499. This appears to be another way of saying that in order to meet the criteria of Listing 12.05C, a claimant must not only have a qualifying valid I.Q. score, but must also satisfy the requirements of the introductory paragraph of that Listing:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

Listing 12.05C.

---

[3] In <u>Lowery</u>, the Commissioner conceded that the I.Q. score was valid and that the claimant had additional work-related limitations. 979 F.2d at 838. Hence, the only issue was whether there was evidence that the mental retardation manifested itself before age 22. *Id.*

In an unpublished case, the Eleventh Circuit states that a showing that "a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive functioning; and (3) have manifested deficits in adaptive behavior before age 22." Pettus v. Astrue, 226 Fed.Appx. 946, 948 (11th Cir. Apr 5, 2007) (not selected for publication in the Federal Reporter, No. 06-15667). However, "Listing 12.05 does not require *significant* deficits in adaptive functioning; it only requires that there be 'deficits in adaptive functioning initially manifested during the developmental period; i.e., . . . before age 22.' 20 C.F.R., Part 404, Subpart P, Appendix 1 § 12.05." Cammon v. Astrue, *supra*, 2009 WL 3245458, *11.

As noted in Lowery, in Popp the court sustained the ALJ's rejection of a claim of equivalency to Listing 12.05C because the claimant's I.Q. score of 69 was "inconsistent with evidence that [the claimant] had a two-year college associate's degree, was enrolled in a third year of college as a history major, and had worked in various technical jobs such as an administrative clerk, statistical clerk, and an algebra teacher." 979 F.2d at 837, citing Popp, 779 F.2d at 1488. Additionally, there was evidence in Popp that the claimant had "tended to place himself in a very unfavorable light," thereby rendering the personality test scores (the MMPI, not the I.Q. test) invalid in the opinion of the examiner. Popp, 779 F.2d at 1498-1499, 1500.

Popp is perhaps the strongest case for finding that an I.Q. score below 70 does not necessarily meet Listing 12.05C. There are several others with facts somewhat like Popp.

For example, <u>Bischoff v. Astrue</u>, 2008 WL 4541118 (S.D. Fla. Oct 9, 2008) (No. 07-60969-CIV), affirmed the determination that Listing 12.05C was not met. The court noted that while the claimant's I.Q. scores were lower than 70, the claimant had previously worked as a parts manager and an automobile mechanic, jobs which required technical knowledge and skills, and he successfully supervised other people for five years. *Id.*, at *20. There was also evidence that the claimant was "faking" his I.Q. score, and gave conflicting reports that he had finished only the sixth, or seventh, or eighth, or ninth, or tenth grades, or had a G.E.D., or had vocational training. *Id.*

In <u>Outlaw v. Barnhart</u>, 197 Fed.Appx. 825, 827 (11th Cir. Aug 10, 2006) (not selected for publication in the Federal Reporter, NO. 05-15996), the court affirmed the finding that Listing 12.05C had not been satisfied, noting that the claimant had an I.Q. *above 70 (*which, standing alone, distinguishes it from the case at bar), and "had worked for several years as an adult as a van driver, a security guard, and in the shipping and receiving department at a pecan plant," and these activities were inconsistent with his I.Q. scores.

The same result occurred in <u>Davis v. Astrue</u>, 2008 WL 2939523 (M.D. Ala. Jul 25, 2008) (No. CIV.A. 2:07CV880-TFM). In that case, although the claimant had an I.Q. score under 70, she had completed twelfth grade, received training in cosmetology and secretarial skills, had a driver's license, was able to read, write, and perform simple math, and a consulting psychologist had determined that she was in the borderline level of intellectual functioning rather than mildly retarded. *Id.*, at *3.

To like effect is <u>Brown v. Astrue</u>, 2009 WL 2135005 (S.D. Ga. Jul 15, 2009) (No. CV608-036). In that case, the court affirmed the ALJ's denial of the claim. Although the claimant had performance and full scale I.Q. scores below 70, he admitted in his work questionnaires "that while working as a carpenter he was a lead worker who supervised, hired, and fired employees, and regularly used machines and technical knowledge and skills, including taking measurements and making calculations. . . . And as a farmer he also supervised other workers." 2009 WL 2135005, *5, n. 5. *See also*, <u>Lyons v. Astrue</u>, 2009 WL 1657388, *10-11 (M.D. Fla. Jun 10, 2009) (No. 208-CV-614-FTM-29SPC) (the claimant obtained a high school diploma, did not take special education classes, could take care of his personal needs, earned from $13,000 to $18,000 per year for 7 years, and there was evidence that he was malingering when he took the intelligence tests).

A case with different result is <u>Durham v. Apfel</u>, 34 F.Supp.2d 1373 (N.D. Ga. 1998).[4] There, the court held:

> Mr. Durham's work history does not support the ALJ's implication that he successfully worked for 40 years. He had no earnings whatsoever in nine years between 1953 and 1991, and minimal earnings several other years (TR 101-102). Mr. Durham has worked primarily as a heavy laborer (TR 46). There is no evidence that these jobs are beyond the reach of a mildly retarded individual.

34 F.Supp.2d at 1380. Distinguishing <u>Popp</u>, the court said:

> Unlike Mr. Popp, Mr. Durham's work experience does not include technical jobs, but jobs as a laborer. He did not teach high school algebra, he worked as a tire repairer, laborer, kitchen helper and material handler (TR 46). Mr. Durham did not go to college, he went to the fourth grade.

---

[4] This is a report and recommendation to a district judge by a magistrate judge. The report and recommendation was adopted by the court. Case No. 1:97cv2061IRWS, doc. 12 entered on December 22, 1998, available on PACER. No appeal was taken.

*Id. See also,* <u>Markle v. Barnhart</u>, 324 F.3d 182, 187 (3d Cir. 2003) ("ability to pay his

own bills, add and subtract, use an ATM machine and to take care of all his own

personal needs," and "ability to identify and administer his medication; his previous jobs;

his obtaining a GED" were not inconsistent with a finding of mental retardation and the

I.Q. scores) (citing <u>Brown v. Sec'y of HHS</u>, 948 F.2d 268, 270 (6th Cir. 1991), "rejecting

the Commissioner's argument that a claimant's full scale IQ of 68 was inconsistent with,

among other things, his driver's license and work history as a truck driver, limited

literacy and sixth grade education, and ability to make change, do laundry, and clean

his room.").

        The case at bar is much more like the evidence in <u>Durham</u>, <u>Markle</u>, and the last

<u>Brown</u> case.  There is no evidence here that Plaintiff was malingering or failed to make

an effort on her I.Q. tests, and no evidence that the test scores were invalid.  Two valid

tests scored Plaintiff's lowest I.Q.'s at 59 and 67.  Plaintiff worked only has a laborer for

Quincy Farms, a job that required only that she pick mushrooms, and lift and carry, and

little else.  Her ability to drive a motor vehicle short distances, to cook and take care of

personal needs, and to handle cash without a bank account, is offset by her reliance

upon her family and daughters for more complicated activities and help in raising her

children.

        The evidence of "deficits in adaptive functioning initially manifested during the

developmental period" is undisputed.  Plaintiff could only attend special education

classes.  Early on, it was thought that she could not gain more than a third grade

education.  At age 48, she tested as having the reading, spelling, and math ability of

someone with a second or third grade education.  Her general adaptive composite

score, 65, was "extremely low" and in the bottom 1 percentile.

For all of these reasons, it was error to fail to conclude that Plaintiff has proved a

valid I.Q. score between 60 and 70, with deficits in adaptive functioning initially

manifested in the developmental period.  The ALJ should have concluded that the first

two requirements of Listing 12.05C are met.  This leaves for consideration the third

requirement, additional physical or mental impairments.

### Physical or other mental impairments imposing additional and significant work limitations

Listing 12.05C also requires evidence of "a physical or other mental impairment

imposing an additional and significant work-related limitation of function."  Under an

earlier version of this Listing, our circuit interpreted this as something that is "significant"

but less than a "severe impairment" as defined at Step 2.  Edwards by Edwards v.

Heckler, 755 F.2d 1513, 1515 (11th Cir. 1985) (emphasis added).  But as pointed out in

Carroll v. Astrue, 2009 WL 1708073, *1 (M.D. Ala. Jun 17, 2009) (No. CIV. A.

108CV74-SRW), this was modified in 2000 and the introductory paragraph of Listing

12.00 now equates this criterion with a "severe" impairment as intended at step 2 and

governed by 20 C.F.R. §§404.1520(c) and 416.920(c).

At step 2, the ALJ found that Plaintiff has two severe impairments in addition to

borderline intelligence quotient:  a history of degenerative disc disease and right eye

blindness. R. 19.  A "severe" impairment at step 2 is a condition which has more than "a

minimal effect on her ability to:  walk, stand, sit, lift, push, pull, reach, carry, or handle,

etc."  Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. §

404.1521). The "work-related limitation of function" intended by Listing 12.05C is the

same form of impairment. Consequently, it cannot now be disputed that Plaintiff has "a

physical or other mental impairment imposing an additional and significant work-related

limitation of function," that is, a history of degenerative disc disease and right eye

blindness. Etheridge v. Astrue, 2009 WL 3233899 (S.D. Ala. Sep 29, 2009) (No. CIV.

A. 08-00357WSB) (finding of "severe" physical impairments at step 2 *ipso facto* was a

finding that the claimant had shown an impairment as required by the second prong of

Listing 12.05C); Carroll v. Astrue, 2009 WL 1708073, *2 (same).

The record fully supports this conclusion. Right eye blindness, standing alone,

satisfies Listing 12.05C. While a person can work with blindness in one eye, right eye

blindness has more than a "minimal effect" upon a person's ability to walk, stand, sit, lift,

pull, reach, or do other kinds of exertion needed to hold a job.

Further, the record fully supports a finding that Plaintiff's ability to do work is also

significantly compromised by degenerative disc disease, and certainly more than a

"minimal effect." On October 14, 2000, Plaintiff had an automobile accident causing

injury and pain to her cervical and lumbosacral spine. R. 354. An MRI showed a large

left L4-5 herniated disc compressing the left L5 nerve root. R. 385. On September 17,

2001, she had spinal surgery at L4-5, including a discectomy and nerve root

decompression. *Id.* Two years later, on July 18, 2003, Plaintiff's treating physician

determined that Plaintiff had a 1 percent whole body permanent impairment. R. 325.

He said that as a result of the injury, without interruptions, Plaintiff could sit for only 2

hours, and could stand or walk for only 1 hour. R. 326. Weight lifting and carrying was

said to be in the light work range.[5]  *Id.*  An ability to do light work was confirmed on

January 22, 2004, and this was consistent with Plaintiff's current work status.  R. 284.

On September 1, 2005, however, Plaintiff injured her back trying to lift heavy

trash from a trash can.  R. 250.  It was noted that she had been on "light duty" since her

prior worker's compensation injury (another injury when she was hit by a cart), and did

not usually have to lift heavy things.  *Id.*  The diagnosis was acute lower back strain.  *Id.*

On September 21, 2005, she was limited to alternatively standing or sitting as needed,

no overhead work, no pushing, pulling, and limited to carrying 5 to 10 pounds.  R. 243.

An MRI on October 5, 2005, reveal a minimal disc protrusion at L5-S1 with a tear.  R.

268.  She had lower back pain radiating to the left leg, with numbness, following the

injury at work in August, 2005.  R. 268.  On November 11, 2005, Plaintiff had completed

4 weeks of physical therapy for treatment of her L4-5 disc bulge.  R. 445.  It was noted

that Plaintiff had "not responded to treatment as anticipated and medical reassessment

is requested."  *Id.*  It was thought that a TENS unit would help.  *Id.*

Plaintiff was seen again on November 17, 2005, by Christopher Rumana, M.D.,

Plaintiff's surgeon in 2001.  R. 367-369.  Dr. Rumana noted that she had had "a long

history of back and left leg pain."  R. 367.  She had a motor vehicle accident on October

14, 2000, and was treated with surgery.  *Id.*  She had another motor vehicle accident,

hitting a deer, and had recurrent left leg pain.  *Id.*  She had a new injury on October 18,

2002, when she was lifting a basket of mushrooms, and was hit by a vehicle.  *Id.*  It was

---

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. §§ 404.1567(b) and 416.967(b).

noted on January 6, 2005, that she had chronic back and left leg pain, but she went back to work. *Id.* On August 8, 2006, she lifted a trash bag and exacerbated her back again, with increasing pain going into her left leg. *Id.* She had "not had tremendous benefit" with physical therapy. *Id.* She had a "lot of problems" with pain from her back down her left leg and in front of her left leg. *Id.* She had come in for a neurosurgery reevaluation. *Id.* On examination it was noted that Plaintiff had decreased range of motion of her back in all directions. R. 368. Reviewing the October MRI, Dr. Rumana said that Plaintiff had mild disc degeneration and bulging at L5-S1, unchanged from 2004. *Id.* and R. 369. Dr. Rumana determined that there was no acute new injury, but exacerbation of the old injury. R. 369. Light duty was recommended, and Plaintiff was still at work. *Id.* Epidural injections were prescribed and administered *Id.* and R. 384.

An MRI on March 29, 2007, revealed asymmetric and left lateral bulging of the disc at L4-5, with neural foraminal encroachment, but without definite disc fragment. R. 344. Facet arthritis at L4-5 and L5-S1 was also noted, with "some evidence to suggest active inflammation." *Id.*

Plaintiff was seen by Dr. Alexander on May 30, 2007. R. 339. She complained of "chronic, unrelenting pain in her neck and her low back." *Id.* Her lumbar range of motion was reduced 50% from the expected range. *Id.* After reviewing the latest MRI images, Dr. Alexander determined that Plaintiff's symptoms "continue to relate to her prior condition. She has pain, but her weakness throughout the left leg is felt to be nonphysiologic." *Id.* He also thought that "there is no compressive lesion in the cervical spine that could account for weakness in all major muscle groups." *Id.* He found,

however, that Plaintiff had permanent impairment. *Id*. He recommended physical therapy. *Id*. Plaintiff participated in six physical therapy sessions. R. 581-586.

This evidence shows without dispute that Plaintiff proved the third criterion for Listing 12.05C, that she has "a physical or other mental impairment imposing an additional and significant work-related limitation of function."

**Conclusion**

In summary, the ALJ's determined that Plaintiff did not prove that her impairments met Listing 12.05C is not supported by substantial evidence in the record. If this recommendation is adopted, the court need not consider Plaintiff's second issue, whether the ALJ erred in finding her testimony to not be credible.

Whether to remand for further consideration is the next issue. The court should not remand. "Reversal is warranted where the record is fully developed and, upon the application of correct legal standards, the claimant is entitled to benefits." Durham, 34 F.Supp.2d at 1381, citing Carnes v. Sullivan, 936 F.2d 1215, 1219 (11th Cir. 1991). The record is fully developed. That is the proper remedy here.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the Commissioner be **ORDERED** to grant Plaintiff's applications for benefits.

**IN CHAMBERS** at Tallahassee, Florida, on November 30, 2009.

**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.